MAYES et al. v. PALMER.

(Circuit Court of Appeals, Eighth Circuit.   October 9, 1913.)

No. 3,804.

1 BANKRUPTCY (§ 159*)—PREFERENCES—VACATION — REQUISITES — DEED OF TRUST.

To entitle a bankrupt's trustee to set aside a deed of trust executed by the bankrupt as a preference in violation of Bankruptcy Act July 1, 1898, c. 541, § 60, subds. "a," "b," 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1911, p. 1506), as they stood in 1903 when the deed was executed, it was essential that the trustee prove, first, that the bankrupt was insolvent at the time of the transfer; that the transfer was made within four months of the filing of the petition; that its effect would be to give the creditor a greater percentage of his debt than other creditors of the same class; and that such creditor had reasonable cause to believe that it was intended by the transfer to give such preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248, 262, 268–281; Dec. Dig. § 159.*]

2. PARTNERSHIP (§ 52*)—WHAT CONSTITUTES—EVIDENCE.

Where a bankrupt and another were jointly interested in ventures in Mississippi and jointly bought real estate, but there was no proof that either could sell without the consent of the other, and they never used any firm name, purchasing the property in the names of both, a partnership was not shown.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 75, 79; Dec. Dig. § 52.*]

3. BANKRUPTCY (§ 167*)—PARTNERSHIP—PREFERENCES.

Since partnership creditors are entitled to be first paid out of firm assets and individual creditors out of individual assets, if an individual member of a firm which is insolvent transfers his property in payment of a firm debt, such transfer constitutes a preference in violation of Bankruptcy Act July 1, 1898, c. 541, § 60a, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), not by the firm but by the individual member.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 282; Dec. Dig. § 167.*]

4. BANKRUPTCY (§ 303*)—PREFERENCES—INTENT TO PREFER—KNOWLEDGE.

In a suit by a bankrupt's trustee to set aside a deed of trust executed by the bankrupt within four months prior to the filing of the petition as security for certain notes, evidence held to warrant a finding that the beneficiary of the deed had reasonable cause to believe that a preference was intended.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

Appeal from the District Court of the United States for the Eastern District of Missouri; Smith McPherson, Judge.

Suit by Joseph R. Palmer, as trustee in bankruptcy of William W. Reid, bankrupt, against W. O. Mayes and another. Judgment for plaintiff, and defendants appeal. Affirmed.

Shepard Barclay, of St. Louis, Mo. (O. H. Avery and R. H. Norton, both of Troy, Mo., and William R. Orthwein, P. H. Cullen, and Thomas T. Fauntleroy, all of St. Louis, Mo., on the brief), for appellants.

Byron F. Babbitt, of St. Louis, Mo., for appellee.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
208 F.—7

Before HOOK and SMITH, Circuit Judges, and VAN VALKEN-BURGH, District Judge.

SMITH, Circuit Judge. This was a suit by Joseph R. Palmer, as trustee in bankruptcy of William W. Reid, to set aside a deed of trust of 230 acres of land made by the bankrupt to W. O. Mayes, as trustee for Charles A. Mayes, as an unlawful preference under subdivisions "a" and "b" of section 60 of the bankruptcy act of 1903. So far as material those sections then read:

"(a) A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, * * * made a transfer of any of his property, and the effect of the enforcement of such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required."

"(b) If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

[1] To entitle the trustee to a decree it was necessary that it appear: First, that William W. Reid was insolvent at the time of the transfer; second, that the transfer was made within four months of the filing of the petition in bankruptcy; third, that the effect of the transfer would be to enable Charles A. Mayes to obtain a greater percentage of his debt than other creditors of the same class; and, fourth, that Charles A. Mayes had reasonable cause to believe that it was intended by the transfer to give such preference.

It appears that William W. Reid, the bankrupt, had been for many years county judge of Lincoln county, Mo., retiring about January 1, 1907. He had been a farmer, a merchant, and a banker. In the later years he resided at Elsberry, Mo. He had an excellent reputation for integrity and was supposed for a long time to be wealthy. June 22, 1908, a petition in involuntary bankruptcy was filed against him and on October 2d he was adjudged a bankrupt. On November 23d Joseph R. Palmer was elected and qualified as trustee as provided by law. November 24, 1903, William W. Reid borrowed of Charles A. Mayes $2,500 upon an unsecured note signed by himself and B. C. Welch due one year after date, with interest at 7 per cent. About 1906 or 1907 Charles A. Mayes bought two notes both signed by William W. Reid and B. C. Welch, one dated in March, 1902, for $91, due six months after date, and the other dated in April, 1902, for $500, due one year after date. On January 24, 1908, Charles A. Mayes loaned William W. Reid $3,000 upon the note of Reid and B. C. Welch due one year after date. The obligations of Reid to Mayes, exclusive of interest, thus amounted to $6,091. In the spring of 1908 Charles A. Mayes suddenly became insistent upon these notes being paid or secured. He had held the note of November 24, 1903, which had been past due for nearly 3½ years, and never collected any interest upon

it; had held for approximately two years the note for $500, which had been due in the spring of 1908 for five years, and no interest had been paid; the note of $91, which had been due at the same time, 5½ years, and no interest had been collected. These notes had never been renewed or extended, and yet in January, 1908, he made an additional loan of $3,000. He contends that William W. Reid and B. C. Welch were in partnership, and, while Mayes' notes originally constituted partnership debts, they were assumed individually by Reid; that Reid's property exceeds his individual debts, including the notes held by Mayes; and that, as Reid's individual debts must be first paid out of his individual property and the firm debts be first paid out of the firm property, there was no legal preference in Reid's securing him so long as it did not make the aggregate of Reid's individual debts exceed his individual property.

[2] Conceding for the time the legal position of appellants, the question at once arises: Do the facts essential to the application of the legal principles exist? Were William W. Reid and B. C. Welch partners? It is true they were jointly interested in some ventures in Mississippi but it is not every joint venture which constitutes a partnership within the meaning of the law. They jointly bought land but there is no evidence that either could sell without the consent of the other. They never had any firm name. Of course this is only a circumstance which would not be conclusive. 30 Cyc. 419. They borrowed money but always in the names of William W. Reid and B. C. Welch and never in any firm name.

The Supreme Court in Thompson et al. v. Bowman, 6 Wall. 316, 18 L. Ed. 736, said:

"There is no doubt that a copartnership may exist in the purchase and sale of real property equally as in any other lawful business. Nor is there any doubt that each member of such copartnership possesses full authority to contract for the sale or other disposition of its entire property, though for technical reasons the legal title vested in all the copartners can only be transferred by their joint act. But the fact that real property is held in the joint names of several owners, or in the name of one for the benefit of all, is no evidence of copartnership between them with respect to it. In the absence of proof of its purchase with partnership funds for partnership purposes, real property standing in the names of several persons is deemed to be held by them as joint tenants, or as tenants in common; and none of the several owners possesses authority to sell or bind the interest of his co-owners."

The referee and the District Court both found there never was any partnership and in that finding we concur. But even if there was a partnership all the obligations were included in notes signed in the individual names of William W. Reid and B. C. Welch, and one holding the individual note of William W. Reid and B. C. Welch could not be informed that these men were partners, and he could recover nothing from William W. Reid until his individual debts were all paid. There is no such rule as this on the marshaling of assets.

[3] Again it was held in an opinion by then Judge Lurton (Mills v. Fisher, 159 Fed. 897, 87 C. C. A. 77, 16 L. R. A. [N. S.] 656), that, as the partnership creditors are entitled under the rule with reference to

the marshaling of assets to be first paid out of the firm assets and the creditors of the individual members to be first paid out of the individual assets, if an individual member while the firm is insolvent transfers his property in payment of a firm debt, that constitutes a preference not by the firm but by the individual member under subdivision "a" of section 60 of the bankruptcy act.

For all three of these reasons we think this position of the appellants could not be sustained, and the last two reasons would defeat the appellants' contention even if there was a firm and if there had been an express adoption of the debts of the firm by William W. Reid. Treating the notes signed by William W. Reid and B. C. Welch as the indebtedness of William W. Reid, there can be no doubt that he was hopelessly involved on May 28, 1908.

The evidence shows the transfer was made within four months of the filing of the petition, and it appearing that William W. Reid was at the time hopelessly insolvent, it is quite apparent that the effect of the transfer if sustained would be to enable Mr. Mayes to obtain a greater percentage of his debt than the other creditors of the same class.

[4] The sole question, then, is: Did Mr. Mayes have reasonable cause to believe that it was intended by the transfer to give a preference? While conceding that he had held William W. Reid's paper for years after it was due and no interest had been paid thereon, Mr. Mayes explains his sudden anxiety for security upon the theory that he had become ill and was in fear of death and wished his affairs left in a settled state. While he may have been ill, he was all the time up and about. He returned with his wife from spending the winter in the South about April 1, 1908. He met Mr. Reid on the train when returning but did not then mention the subject of security. In a week or two thereafter he met Reid near the depot and they walked thence up to the schoolhouse; Mayes urging security. Again they met in a vacant house and talked the matter over, and again Mr. Mayes took Mr. Reid out buggy riding and again urging security. Mr. Reid testified that in the first conversation Mr. Mayes asked for security and Mr. Reid told him he did not like to do it. Mr. Mayes said he wanted to get his things in better shape. He was not satisfied with it in that shape; did not think it was safe. He could sleep better if he had some security. Mr. Reid told him he thought he could get some money for him before a great while. Mr. Mayes said:

"A fellow says he will sometimes get money when he don't get it."

He was not satisfied about the condition things were in. Mr. Reid testified in the last talk he told Mr. Mayes that he did not like to ask his wife to sign the papers. Mr. Mayes said she did not have to sign them. He said he did not propose to have it recorded; did not aim to have it recorded.

."The day we fixed it up Mr. Mayes said he would leave it with Mr. Palmer; there would be nothing done in this until you give your consent to it or know about it or something to that amount. Mr. Mayes spoke to me frequently about security, insisted on it. I told him he would get his money. He said he didn't think he would. He was afraid he wouldn't."

Mr. Palmer, the trustee, testified that about May 14th Mr. Mayes asked him:

"If a man had some notes against a party part due and part not due, could he sue all of them, those that were not due as well as those that were due?"

That Mr. Mayes was back in his office some time from the 24th to the 27th of May and said:

" 'I have some notes against Reid and I have learned that he is very heavily indebted' or 'broke' or something to that effect. It left the impression with me that the judge was busted. He says, 'Part of them are due and part not due;' and he says, "I have been trying to get Judge Reid to give me some security but he has not done it yet.' He says, 'I am going to try further to get the security.' He said he would sue Judge Reid but if he did the other people would all come in and there would not be anything for any of them; his other creditors would file suits and there would not be anything for any of them. Mr. Mayes said, referring to the deed of trust, 'I have agreed to leave it here with Joe for him to keep and nothing to be done with it,' or 'not record it,' I do not recall just which he said, 'until you (Judge Reid) give your consent.' "

Mr. Palmer further testified that on June 5th Mr. Mayes came to his office and asked Palmer if he would let him have the deed of trust. Mr. Palmer told him that he knew the agreement under which it was left there and that he would rather not do it unless Mr. Reid was present and gave his consent. Mr. Mayes said if he would let him have it he would take it by Judge Reid's house that evening and unless Judge Reid gave his consent that he should have it recorded he would leave it with Judge Reid. Mr. Palmer told him that under these circumstances he would let him have it and did so.

While it is true that substantially all of this evidence is denied by Mr. Mayes, the mere recital of it is sufficient to show that we ought not to interfere with the finding of the trial Judge that Mr. Mayes had reasonable cause to believe that it was intended by the transfer to give a preference. This conclusion makes it unnecessary to consider other points raised in the argument, and the decree is affirmed, at the cost of the appellants.