## In re WIENER.

### NOTEWARE v. WIENER.

District Court, W. D. New York. February 18, 1929.

Goldring, Sherman, Reisman & Killeen, of Buffalo, N. Y. (Henry W. Killeen, of Buffalo, N. Y., of counsel), for bankrupt.

Saperston, McNaughton & Saperston, of Buffalo, N. Y. (Alfred M. Saperston, of Buffalo, N. Y., of counsel), for trustee.

HAZEL, District Judge. The involuntary petition in bankruptcy herein was filed November 28, 1927, a few days after the bankrupt Wiener sold his goods on hand and closed out his business as a dealer in produce. Subsequently, on his examination under section 21a of the Bankruptcy Act; 11 USCA § 44(a), evidence was adduced, as certified by the referee, that on December 12, 1927, the bankrupt possessed $11,183, which he willfully withholds from the trustee herein. An order was made directing him to deliver the amount to the trustee within 10 days, and, failing so to do, the trustee was directed to move for confirmation of the report and for punishment of the bankrupt as and for his contempt in disobeying the turnover order. The bankrupt has petitioned for review of the findings of the referee, and the review together with the motion to punish for contempt have by consent been heard together.

After the first hearing herein, the matter was referred back to the referee, with instructions to make specific findings and conclusions, instead of a mere summary of the testimony. Numerous specific findings have now been filed, and the case reargued. The finding specifically is that the bankrupt had in his possession and under his control on February 15, 1928, the sum of $11,183, which he unlawfully withholds from the custody of the trustee, after notice of the turnover order. Counsel for the bankrupt objects to their consideration and to the conclusions on the ground that they date back to February 15, 1928, although originally made in the preceding month of August. But these objections may be safely overruled, since they relate to the time of the turnover order as previously made. It was shown to the satisfaction of the referee that the bankrupt had the money in his possession or under his control, and the implication followed that he had the ability to comply with the order. It is also suggested that the referee refused to consider briefs and arguments before making the specific findings now submitted, but since this appealed to the discretion of the referee, and as he had previously made the turnover order, following argument, there was no necessity for reargument with relation thereto.

Much testimony was taken before the referee in relation to the alleged concealment of money collected by the bankrupt a few days before and directly after this proceeding was instituted. A summary shows that he and his brother had been carrying on business as partners; that on July 2, 1927, the partnership was dissolved and the bankrupt continued alone. At the time of dissolution the firm owed to the Bank of Buffalo $3,000, and $3,000 to the mother of the partners, besides $5,000 to their sister— liabilities assumed by the bankrupt. The assets consisted only of accounts receivable and some money on deposit in the bank. The bankrupt swore he owed his brother $8,000 or $9,000 at the time of the dissolution of the firm, and that the debt was canceled. It substantially appeared, however, that he owed his brother $4,000, and gave his promissory note as security; also that on November 15th checks were made out to creditors for $12,000, which, however, were never signed or delivered; and, further, from July 1, 1927, to the following November he asserted that he owed an additional amount of $15,000. At such time he was not possessed of any substantial assets. He swore, on his examination, that on November 25th he sold out his merchandise, and that the money realized on the sale and from

accounts receivable, collected by him a few weeks before the petition in bankruptcy was filed, amounting to $8,183, together with $3,000 on hand in cash, had been lost by him in gambling, playing poker and craps for large stakes at various times between November 14 and 26, 1927. He admitted winning $2,000 on one occasion, but later, he says, lost it in games. None of the bills receivable collected by him were noted in his books. In all he had collected, after November 15th, approximately $10,500, out of which he paid on promissory notes, indorsed by his brother and held by the Marine Trust Company, $2,000, and to his counsel $521. In disposing of his business, he also sold a large quantity of bags or containers of fruit or produce below their cost price. Book entries show that he had taken $11,183 from the business during the period of 12 days, beginning November 14th, in addition to his salary of $50 per week. It is conceded that the bankrupt was an inveterate gambler; that he gambled often in the rear of his store with six or seven persons named by him, at various times between November 14th and 26th, and also at the so-called Alpha Club. None of the witnesses with whom he gamed, and to whom he claims to have lost the major amount of his money, admit gaming with him between November 14th and 26th, all testifying that the last time they saw him playing cards or dice for stakes was prior to November 10th; while the witness Gable, an employee of the Alpha Club, testified that the bankrupt lost $100, $150, and $200 or $230 on three different occasions at the club, but on the night of November 26th he won $2,000, losing not more than $50 on the next night, though the bankrupt says he lost his winnings of $2,000. There is much testimony of a similar nature, but it is vague and indefinite in important particulars, as to the extent of his losses.

It is contended by counsel for the bankrupt that the evidence is wholly insufficient to sustain the finding that the bankrupt is possessed of $11,183, or any other amount belonging to the bankrupt estate; in short, that the findings of the referee were illogical, inconsistent, and contrary to the weight of the evidence and the law. It is also strongly urged that the proofs, properly considered, preponderatingly show that the bankrupt daily and nightly played for high stakes, losing as high as from $400 to $1,500 at different times during the month of November, 1927, either in the rear of his produce store, or in Goldstein's place, or at the Alpha Club, and at these times losing, on 10

different evenings immediately preceding bankruptcy, the aggregate amounts stated; and that in this way the money collected by him was squandered and wasted, and hence it is impossible for him to comply with the turnover order.

The referee found, on conflicting testimony and upon the bankrupt's failure to account for his collections when the business was sold and the amount deposited in the bank, that he did not lose all of said money gambling, and that his testimony is discredited by other reliable testimony.

In such a situation, the rule is that, where a bankrupt fails to give satisfactory or reasonable explanation of what became of his money, either in his possession or under his control, the turnover order is justified, and, for failure to surrender to the trustee when directed so to do, he may be adjudged in contempt. The burden of proving that he was possessed of the money or that the amount was under his control was upon the trustee. It was not necessary that it be shown beyond reasonable doubt, as in a criminal case, or that the bankrupt did not in fact squander the money in gaming. It suffices if the turnover order is supported by clear and convincing evidence. See the Oriel & Prela Case, 49 S. Ct. 173, 73 L. Ed. ——, recently decided by the Supreme Court. In that case Mr. Chief Justice Taft, writing the opinion of the court, definitely decided, first, that the turnover order proceeding is civil in its nature; and, second, that the order should be based on clear and convincing evidence, and not merely on preponderance of evidence.

With this rule in mind, I have considered the evidence and reached the conclusion that clear and convincing evidence was adduced before the referee to substantiate the turnover order. The testimony of various gamesters with whom the bankrupt played, and to whom he claims to have lost his money, and who denied winning it, and in some instances denied playing with him during the specified time, may not be wholly free from criticism, as the bankrupt's counsel contends, since, he says, it is extremely doubtful whether they would confess any unlawful gains, or that they engaged extensively in gambling. But the finding is not based entirely upon the testimony of such witnesses. There are other facts and circumstances indicative of the improbability of Wiener's gambling losses between November 14th and 26th, as, for example, the sale of all his merchandise, and his payment of $2,000 on a note at the bank,

upon which his brother was an indorser, before maturity, together with his assertion that he owed his brother, $8,000, when, according to his brother's testimony, it was only $4,000. There is also other evidence from which the referee might well draw the inference that his explanation and account of losses was untrue. Although the evidence shows clearly enough that he was an inveterate gambler, yet his claimed heavy losses, without substantial corroboration, seem incredible and indicated that, at the time of the turnover order, he was physically able to deliver the money to the trustee, or a substantial part thereof. The findings of the referee are entitled to great weight, not only because he heard the testimony and noted the appearance of the witnesses, but also as bearing upon the truthfulness of the purported explanation that the money collected from his customers and sale of merchandise was entirely squandered in games of chance (Epstein v. Steinfeld [C. C. A.] 210 F. 236; Free v. Shapiro [C. C. A.] 5 F. (2d) 578)—a claim that is always fraught with suspicion—(Schweer v. Brown [C. C. A.] 130 F. 328) and one that in the instant case was not sufficiently or truthfully corroborated either by Shapiro, Acqueeno, or Margaret Schmelz. The inference that a large amount of the money so claimed to have been lost is still in the bankrupt's possession or under his control, notwithstanding his denial, was not unwarranted. His denial, and such other testimony adduced in his behalf, do not overcome the reasonable inference of the falsity of his protestations. The money, or a large portion thereof, was as fully traced to him as it was possible to do in view of his fraudulent efforts to conceal his assets. I find no error of law or insufficiency of proof upon which a revision of the turnover order is demanded.

As to the contempt in disobeying the turnover order, it suffices to state that nothing of great importance has been claimed or shown regarding the disposition of the amount since the turnover order was entered. No evidence is before me tending to show that the bankrupt is in any different position than at the close of the hearing. Nothing is claimed since then to have occurred to render it impossible for the bankrupt to comply with the referee's order. The quotation from Circuit Judge McPherson, found in the recent Oriel-Prela decision, rendered by the Supreme Court, aptly applies to the present situation; namely, the assertion of the bankrupt that the money is not now in his possession or under his control—an assertion that may not be believed: "The bankrupt may therefore be subjected to the usual pressure that follows willful disobedience of a lawful command, namely, the inconvenience of being restrained of his liberty. No doubt this may be unpleasant; it is intended to be unpleasant, but I see no reason why the proceeding should be condemned, as if it interfered with the liberty of the citizen without sufficient reason or excuse."

It is finally pointed out that, out of the money in question, the bankrupt presumably expended an amount for his support and the support of his wife and two children, from November 10th to February 15th, following examination; that checks were given to various persons, aggregating $816.10. In fairness to the bankrupt, the order confirming the referee should provide a reasonable reduction as to those items. It was also stated that two other checks were paid to certain persons, presumably out of the fund, but as to this I am not sufficiently advised at this time to make reduction.

The review to revise the findings of the referee is denied, save as to modification as to amount.

The motion to punish the bankrupt for his contempt in failing to comply with the turnover order is granted; the commitment directing the bankrupt's confinement until he complies with the order to be stayed for 10 days to afford opportunity to comply therewith; and, if a review or appeal is taken to the Circuit Court of Appeals, a further stay will be granted, on condition that the appeal be taken within 10 days. So ordered.