In re JACKSON.

No. 1192.

District Court, W. D. Arkansas, Fort Smith Division.

Jan. 30, 1935.

Daily & Woods, of Fort Smith, Ark., and W. A. Dickson, of Bentonville, Ark., for trustee.

Pryor & Pryor, of Fort Smith, Ark., for receiver of Benton County Nat. Bank.

Duty & Duty, of Rogers, Ark., and Hill, Fitzhugh & Brizzolara, of Fort Smith, Ark., for receiver of First Nat. Bank of Rogers.

RAGON, District Judge.

This cause is the result of a petition filed by Fred S. Wetzel, receiver of the Benton County National Bank, and E. G. Sharp, receiver of the First National Bank of Rogers, Ark., and E. G. Sharp as trustee and Chas. N. Mundell and Mrs. E. M. Perry, for a review of the referee's order made on July 16, 1934, on a petition filed by Chas. D. Haney, trustee of the estate of W. E. Jackson, bankrupt, which order of the referee held that mortgages executed by these parties prior to the filing of the involuntary petition for bankruptcy were invalid, and that the assets be marshaled and sold free of liens.

A petition in bankruptcy was filed against W. E. Jackson on the 15th day of May, 1931, and on the same day there was filed an answer, duly verified by W. E. Jackson, waiving the issuance and service of subpoena and notice upon him and entering his appearance; and then for his answer he admitted that he was insolvent and had been since the 6th day of December, 1930, and was unable to pay his debts and was willing to be adjudged a bankrupt. He was adjudicated a bankrupt on May 18, 1931. Chas. D. Haney thereafter, on the 20th day of June, 1931, was duly appointed trustee of the bankrupt's estate and effects, and qualified for the same on the 23d day of July, 1931.

On the 6th day of December, 1930, the Benton County National Bank closed its doors, and Fred S. Wetzel was made receiver thereof by the Comptroller of the Currency and placed in charge of its liquidation on December 21, 1930. The bankrupt, W. E. Jackson, was an active vice president of the Benton County National Bank, and had been for some time prior to the time it was taken over by Wetzel. On October 12, 1930, W. E. Jackson executed his note to the Benton County National Bank as evidence of an indebtedness of $9,900. On January 12, 1931, W. E. Jackson, the bankrupt, and his wife, Lena Jackson, executed a mortgage to the Benton County National Bank to secure the note executed on October 12, 1930. This mortgage covered Jackson's undivided one-half interest in the two lots designated as Nos. 11 and 12 in the city of Corpus Christi, Nueces county, Tex. This mortgage was filed for record and recorded in the office of the clerk of the county court of Nueces county, Tex., on the 21st day of January, 1931.

On January 27, 1931, W. E. Jackson and wife, Lena Jackson, gave a mortgage on an undivided one-half interest on the same two lots covered in the Wetzel deed in Corpus Christi, Tex., to E. G. Sharp, trustee. The First National Bank of Rogers, Ark., closed its doors about the 1st of January, 1931, and E. G. Sharp was appointed, by the Comptroller of the Currency, receiver of the same. At the time the bank closed, W. E. Jackson owed the bank approximately $7,-

843.34, and his wife, who owned a separate estate, owed the bank $6,481.95, making their combined indebtedness $14,325.29. The indebtedness against Jackson was evidenced by note dated June 30, 1930, for $7,500, and due six months thereafter. The indebtedness of Lena Jackson was evidenced by two notes dated November 17, 1930, due ninety days thereafter, one of which was in the sum of $3,224, and the other in the sum of $3,160. The undisputed testimony is that Lena Jackson was given credit by E. G. Sharp for the amount of her indebtedness to the bank, and it was incorporated in the $14,325.29 for which W. E. Jackson gave the mortgage to E. G. Sharp, trustee, on January 27, 1931. This mortgage was filed for record and recorded on January 27, 1931, in the office of the clerk of the county court of Nueces county, Tex.

On April 11, 1931, W. E. Jackson and Lena Jackson, his wife, executed a deed of trust to Chas. Mundell and Mrs. E. M. Perry and E. G. Sharp as their trustee, covering the same two lots upon which Wetzel and Sharp had been given mortgages, and further including the nine lots in Robstown, Nueces county, Tex., and the 115-acre tract in Bee county, Tex. The indebtedness for which this mortgage was given as security was for the sum of $4,176.66, being due to Chas. N. Mundell and Mrs. Perry. The original debt was incurred by W. E. Jackson some time prior to 1930, and had never been secured until this mortgage of April 11, 1931, but the note evidencing the debt had been renewed from time to time.

The contention of the trustee that these three conveyances were made while W. E. Jackson was insolvent and amounted to a preference in favor of the grantees in the mortgages, and for this reason should be set aside, was sustained by the referee, and the court is asked to review the referee's findings.

The first question raised by attorneys for the mortgagees in the three instruments heretofore alluded to is that the referee was without jurisdiction to proceed in a summary way or by summary proceedings to determine the controversy in regard to the real property located in Texas. Under the decisions of our courts, this question turns entirely upon whether or not the bankrupt was either in actual or constructive possession of the property at the time of the filing of the petition and the adjudication of bankruptcy. The testimony discloses that W. E. Jackson was in possession of the property, and that the tenants which were occupying the same were paying their rents to an agent who had collected the rents on this property even before W. E. Jackson inherited it from his father. The agent, Ford, had collected rents during the father's lifetime, and continued to do so for the heirs after the death of the father. When W. E. Jackson was adjudicated a bankrupt and Haney was selected as trustee, the agent, Ford, continued to collect the rents and pay them over to Haney as trustee. There is but one conclusion which can be reached from the testimony, and that is that the bankrupt at the time of filing the petition in bankruptcy was in possession of the Texas properties in which W. E. Jackson was interested and that such possession is now in the trustee.

The Circuit Court of Appeals for the Eighth Circuit, speaking through Judge Stone in Gamble v. Daniel, 39 F.(2d) 447, 452, said: "Sections 23, 60b, 67e, and 70e, 11 USCA §§ 46, 96 (b), 107 (e), 110 (e), set forth the jurisdiction of bankruptcy and other courts where there is some dispute as to title or interest in property. It has required judicial construction to state the criterion of jurisdiction set out in these various sections. That criterion is now firmly established to be the possession at the time the bankruptcy petition is filed. [Citing cases.] If such possession be in the bankrupt, the court of bankruptcy has jurisdiction, by summary proceedings, to adjudicate the rights of the parties; while, if such possession is elsewhere, the adjudication must be by plenary suit in the proper federal or state court, if the claimant objects to a summary proceeding in the bankruptcy court. This rule has been so often announced that it is necessary to cite only the latest cases, among which are * * * Taubel-Scott-Kitzmiller Co. v. Fox, 264 U. S. 426, 431, 438, 44 S. Ct. 396, 68 L. Ed. 770."

This decision from the Eighth Circuit cites approvingly Board of Trade of City of Chicago v. Johnson, 264 U. S. 1, 44 S. Ct. 232, 68 L. Ed. 533; Harrison v. Chamberlin, 271 U. S. 191, 46 S. Ct. 467, 70 L. Ed. 897; May v. Henderson, 268 U. S. 111, 45 S. Ct. 456, 69 L. Ed. 870.

A recent case from the Ninth Circuit, Street v. Pacific Indemnity Company (C. C. A.) 61 F.(2d) 106, also announces this rule.

In the case of Taubel-Scott-Kitzmiller Co. v. Fox, 264 U. S. 426, 44 S. Ct. 396, 398, 68 L. Ed. 770, upon which the Circuit Court of Appeals of the Eighth Circuit bases its

decision, reads as follows: "By the act of 1898 as originally enacted, the power of the bankruptcy court to adjudicate, without consent, controversies concerning the title, arising under either Section 67e or section 60b, or section 70e [11 USCA §§ 107 (e) or 96 (b) or 110 (e)], was confined to property of which it had possession. The possession, which was thus essential to jurisdiction, need not be actual. Constructive possession is sufficient. It exists where the property was in the physical possession of the debtor at the time of the filing of the petition in bankruptcy, but was not delivered by him to the trustee; where the property was delivered to the trustee, but was thereafter wrongfully withdrawn from his custody; where the property is in the hands of the bankrupt's agent or bailee; where the property is held by some other person who makes no claim to it; and where the property is held by one who makes a claim, but the claim is colorable only. As every court must have power to determine, in the first instance, whether it has jurisdiction to proceed, the bankruptcy court has, in every case, jurisdiction to determine whether it has possession actual or constructive. * * *"

■ The bankrupt was in possession of the property at the time of his adjudication, and the trustee has since been in possession of the property, and therefore the bankruptcy court had jurisdiction to summarily proceed against the property in the manner set out in the referee's findings.

Having disposed of the questions of jurisdiction, the pertinent provisions of the Bankruptcy Act which cover the other points involved in this cause are found in 11 USCA:

"Sec. 96. Preferred creditors: (a) A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer to (of) any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of recording or registering of the transfer,

if by law such recording or registering is required or permitted."

"(b) If a bankrupt shall have procured or suffered a judgment to be entered against him in favor of any person or have made a transfer of any of his property, and if, at the time of the transfer, or of the entry of the judgment, or of the recording or registering of the transfer if by law recording or registering thereof is required, and being within four months before the filing of the petition in bankruptcy or after the filing thereof and before the adjudication, the bankrupt be insolvent and the judgment or transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person. And for the purpose of such recovery any court of bankruptcy, as hereinbefore defined, and any State court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction."

■ In order to establish these transactions as voidable preferences, it is necessary for the trustee to show that the transfers were made and made within four months prior to the filing of the petition in bankruptcy that W. E. Jackson was insolvent at the time of the transfers, and that the enforcement of the transfers would enable the mortgagees to secure a greater percentage of their claims than other creditors of the same class, and that the mortgagees knew this, or had reasonable cause to believe it. Remington on Bankruptcy (3d Ed.) § 1630 et seq., Mansfield Lumber Co. v. Sternberg (C. C. A.) 38 F.(2d) 614; Mayes v. Palmer (C. C. A.) 208 F. 97.

The referee, in determining the question of solvency of W. E. Jackson, at the time of the execution of these three mortgages, made the following finding:

"On the question of insolvency, the court expressly finds that at the time of the execution and delivery of said mortgage the bankrupt under the undisputed evidence owed secured and unsecured debts in excess of $52,000.00, and for which he could seek no contribution from others.

"The court further finds that at the time of the execution of the mortgage he owned no personal property except household goods worth $120.00; a 1928 automobile, worth $200.00, a claim against the bank-

rupt, Jackson Dry Goods Company, of the face value of $225.00, and a deposit in the Bank of Cave Springs, since failed, of $35.36, and real estate in Texas and in Benton County, Arkansas, of an aggregate value not exceeding $35,000.00, of which real estate $3500.00 was his home place in Bentonville. That the bankrupt's condition had continued practically the same from that date down until the filing of the petition in bankruptcy."

This particular finding of the referee above quoted referred to the mortgage from Jackson to the Benton County National Bank. And the same finding equally applies to the financial condition of W. E. Jackson at the time of making the other two mortgages or deeds of trust.

The referee in this case heard the testimony of several witnesses, including the testimony of the bankrupt, Jackson, and also the testimony taken by deposition of witnesses in Texas as to the value of the land located in that state. He had occasion to observe these witnesses; their demeanor, together with what interest or prejudice they may have had or manifested in the result of his findings. Great weight should be given to the findings of a referee where he has had occasion to observe the conduct of witnesses testifying before him, and the courts have uniformly held that, while not conclusive upon the District Court, yet his findings should have great weight and should not be disturbed unless manifest errors appear. Ohio Valley Bank Co. v. Mack (C. C. A.) 163 F. 155, 24 L. R. A. (N. S.) 184; In re Wiener (D. C.) 32 F.(2d) 332; In re Oriel (C. C. A.) 23 F.(2d) 410; Free v. Shapiro (C. C. A.) 5 F.(2d) 578; Epstein v. Steinfeld (C. C. A.) 210 F. 237.

Where there is conflicting evidence, such as was in this case, added weight is given to the findings of the referee, and the strength of his findings have been uniformly held analogous to that of a master in chancery.

The court has carefully studied every item of assets and liabilities of the bankrupt, W. E. Jackson, from the date of the execution of the first of these deeds of trust on January 12, 1931, and is of the opinion that the referee's findings that the bankrupt was insolvent on this date was correct in every respect.

The bankrupt filed an answer to the creditor's petition on May 15, 1931, in which he stated he was insolvent and unable to meet his debts, and had been so since the 6th day of December, 1930. He not only signed this statement, but he also made oath to it. Later, when called to testify before the referee, at the hearing on the trustee's petition to marshal liens and sell free and clear of incumbrances, he made the statement that he did not know that included in the answer was his statement as to insolvency since December 6, 1930. It is difficult to give much credit to this statement, in view of the fact that he signed and swore to the petition, which was filed by his attorney.

The bankrupt gave the only testimony tending to show that he was solvent. His estimation of the value of the properties in Texas was 50 per cent. higher than the valuations given by real estate men and by his own agent, Ford, all of whom had lived and resided in the community wherein this property was located for many years. On the contrary, the bankrupt's information with reference to the property was based upon occasional visits of short duration to these communities over a period of years. His testimony with reference to the values of property in Benton county, Ark., when compared to the testimony of other witnesses residing in that community, was no more reliable than his testimony with reference to the value of the Texas property.

Eliminating all the items which are rightfully subject to controversy, the record unmistakably discloses that this bankrupt was insolvent at the time he executed each of these three deeds of trust.

The referee found that the unsecured creditors of the bankrupt, W. E. Jackson, would not and could not receive in excess of 14 per cent. of the face of their claims, and that the Benton County National Bank was an unsecured creditor at the time of the execution of the mortgage to it. The same state of facts applies to the other two mortgages.

In the case of Haas v. Sachs (C. C. A.) 68 F.(2d) 623, 625, it was said: "In general, it may be said that a voidable preference is established by proof that a person, while insolvent, and within four months of the bankruptcy, made a transfer of property, the effect of which will be to enable one creditor to obtain a greater percentage of his debt than other creditors of the same class, if the person receiving it or to be benefited thereby, has reasonable cause to believe that the enforcement of the transfer will result in a preference"—citing Mansfield Lumber

Company v. Sternberg (C. C. A.) 38 F.(2d) 614.

The testimony in this case sustains the findings of the referee that the mortgagees would obtain a greater percentage of their debts than other creditors of the same class, and that the deeds of trust would constitute a voidable preference if the other essential elements of a voidable preference are to be found present in the transactions.

The last essential element of a preference is whether or not the grantees in the mortgages or deeds of trust knew of the bankrupt's insolvency and that the transfer of the property was intended to and did work a preference in their favor.

The testimony discloses that the Benton County National Bank closed its doors on December 6, 1930. On the same date another bank in Bentonville closed its doors. Jackson was an active executive officer of one of these banks and a stockholder in the other. Shortly thereafter, in the same month, the First National Bank of Rogers closed its doors, and W. E. Jackson was a stockholder in this bank. The city of Rogers is only eight miles distant from Bentonville where the other two banks were located. W. E. Jackson's brother was the president of the Rogers Bank which failed, and he had committed suicide just before his bank closed. Wetzel, the receiver of the Benton County National Bank, had been a national bank examiner prior to the time he was designated as receiver, and had investigated as to the financial condition of both the bank at Rogers and the bank at Bentonville in which the Jackson brothers were financially interested. In addition to these banks, the Bank of Cave Springs became insolvent and was placed in charge of the bank commissioner of the state of Arkansas in the month of January, 1931. The Bank of Lowell became insolvent and was taken over by the bank commissioner of the state in January, 1931. The State Bank of Decatur sold all of its assets on the 2d day of February, 1931, to the Bank of Decatur, and among its assets was a note for $2,500. Within a period of less than thirty days all these six banks had closed their doors by reason of their financial condition; the State Bank of Decatur having reorganized and transferred its assets to the Bank of Decatur.

Wetzel in his testimony admits that he knew that the failure of the two banks at Bentonville and the one at Rogers destroyed the values of the property owned by Jackson in Benton county. With this in mind, without any investigation whatever, according to his testimony, he took a mortgage on the property in Texas. Wetzel testifies that he knew nothing of the indebtedness of Jackson to the bank until he had worked down his note indebtedness to the J's, wherein he first discovered that Jackson owed the bank $9,900. Notwithstanding Wetzel had been in charge of the bank for two or three weeks, he states he did not discover that Jackson, an executive officer of the bank, was indebted to it until he was running the note accounts. With the banks breaking with such frequency, the natural tendency of creditors would be to rush in and save themselves if they could. The spirit of "Every fellow for himself and the devil take the hindmost," naturally possessed the creditors of Jackson, who was widely and substantially interested in the banking institutions of his county. What is true with reference to the knowledge of Wetzel, who did not live in that county, but who lived in Missouri, is likewise true of the knowledge of E. G. Sharp, Chas. N. Mundell, and Mrs. E. M. Perry, all of whom lived in the community. The referee found that these parties had knowledge of the insolvent condition of the bankrupt, W. E. Jackson, and had reasonable cause to believe that the mortgages executed to them would be a preference in their favor over other creditors of a like class. The referee's findings are sustained by the testimony in this case.

Under these facts and circumstances, the mortgages executed by W. E. Jackson to E. G. Sharp, as trustee, and to Chas. N. Mundell and Mrs. E. M. Perry, and E. G. Sharp, their trustee, were all within a period of four months of the filing of the petition in bankruptcy, and, the other essential elements of a preference being present, the finding of the referee as to these two transfers is in every respect sustained.

More difficulty, however, is encountered in the finding of the referee that the transfer from Jackson to the Benton County National Bank was a voidable preference, because this transfer was executed before the four-month period began to run, but was recorded within the four-month period.

It is earnestly contended by the Benton County National Bank that this case is governed by the same rule laid down in the case of the First National Bank of Lincoln, Nebraska et al. v. Live Stock National Bank (C. C. A.) 31 F.(2d) 416, 417. Whether or

not this is true the facts in the case peculiarly determine.

The facts in the case of the First National Bank v. Live Stock National Bank were as follows: A. Victor Bryan, a cattle dealer living in Scotts Bluff county, Neb., in October, 1926, made two mortgages to secure two notes, one of $10,000 and another of $8,000. The money was borrowed by Bryan from the Inter-State Live Stock Commission Company, and in due course, before maturity, the notes were transferred to the Live Stock National Bank of Omaha, Neb. The borrowed money was used to purchase the cattle covered by the two mortgages. By mistake the mortgages, about the time they were made, were recorded in Sioux county, Neb., where the cattle were located, instead of Scotts Bluff county, the home of Bryan. On February 23, 1927, Bryan filed his involuntary petition in bankruptcy, and on that day was adjudged a bankrupt. Two days before the filing of the petition, it was discovered an error had been made in the recording of the mortgages, and the mortgages were again recorded in the county where Bryan lived.

The cattle which were bought with the $18,000 which Bryan borrowed were later sold for $38,000, or a profit of $20,000 being disclosed in the transaction. It appears that at the time that Bryan executed these mortgages he was solvent, but at the time the mortgages were recorded he was insolvent.

The court's opinion of the transaction was well expressed in the following language: "The mortgages, at the time they were made, were executed in good faith and to secure a present consideration. They were not for an antecedent debt. They in no way diminished the estate of Bryan, but were given for the purchase price of cattle which greatly enhanced the value of his estate."

The only element which the court apparently considered in the nature of a preference was the fact that the mortgages were recorded in Bryan's home county just two days prior to the filing of the petition in bankruptcy. However, the mortgagee had attempted in good faith to comply with this requirement, but by mistake had recorded the transfers in the wrong county. In the concluding paragraph of the court's opinion it is stated: "Aside from the legal questions involved herein, the equities of the case could scarcely be stronger than they are here in favor of the appellee."

Good faith characterized every step in the transactions, and the cause perhaps would never have been instituted had it not been for an error in the place of recording. In the opinion the court lays special emphasis on the fact that the mortgages were executed in "good faith," and not for "an antecedent debt." In the course of the opinion the court further said: "The whole purpose of the Bankruptcy Act is to protect against preferences and frauds, and not to defraud one who, in good faith, has advanced or loaned money on security to one who was insolvent at the time of the transaction, or later became so, and went into bankruptcy" —citing First National Bank v. Staake, 202 U. S. 141, 26 S. Ct. 580, 50 L. Ed. 967; Rock Island Plow Company v. Reardon, 222 U. S. 354, 32 S. Ct. 164, 56 L. Ed. 231.

The emphasis laid by the court upon the good faith in the transaction involved in this case, and the fact that it was not an antecedent debt, would lead to the conclusion that their opinion would have been otherwise had the security covered an antecedent debt instead of being executed for a present consideration.

In Foltz v. Davis, 68 F.(2d) 495, decided by the Circuit Court of Appeals, Seventh Circuit, the court held that, where a bankrupt was insolvent when he executed and delivered the deeds to the bank, and the bank at the time knew of the bankrupt's insolvency, and the transfer of the property was intended to and did work a preference in its favor, and that the deeds were to secure an antecedent indebtedness to the bank, and that the deeds were executed to the bank more than four months before, but recorded within four months of, the date of the commencement of the bankruptcy proceedings, the transaction could be set aside under section 60b, as voidable preferences.

It will be observed that the facts in the case under present consideration are in exact accord with the facts in Foltz v. Davis. In the case of Foltz v. Davis the court held:

"The answer to the question propounded involves the construction of the meaning of the words 'required or permitted' as used in section 60a, as amended by Act May 27, 1926, 11 USCA § 96 (a), and the single word 'required' as used in section 60b of the Bankruptcy Act (11 USCA § 96 (b). The word 'required' standing alone was defined and construed in Carey v. Donohue, 240 U. S. 430, 36 S. Ct. 386, 60 L. Ed. 726, L. R. A. 1917A, 295. As a result of this decision, the act was amended by Congress so as to

add the words 'or permitted' after the word 'required' in section 60a. So amended, the last sentence of the section defining preferred creditors (section 60a) reads as follows:

"'* * * Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of recording or registering of the transfer, if by law such recording or registering is required or permitted.'

"In other words, the four months' limitation applicable to deeds, the recording of which was required under the state law, was by the amendment extended to transfers, the recording of which was required 'or permitted.' Congress, by its amendment, made its meaning and intention tolerably plain. The fact that the amendment followed the decision of Carey v. Donohue, 240 U. S. 430, 36 S. Ct. 386, 60 L. Ed. 726, L. R. A. 1917A, 295, which overruled the holdings of numerous circuits to the effect that 'required' meant pretty much what 'required or permitted' more obviously and clearly means, is most significant of the congressional intent.

"Appellee contends that Congress did not similarly change section 60b but left the word 'required' therein appearing unqualified. Wherefore he argues that only the preferences described in said section 60b may be set aside. If this view be accepted, then no effect whatever is given to the amendment of section 60a.

"It would seem more logical and consistent with the canons of statutory construction to hold that section 60a and section 60b should be read together, and so read they define a preference and provide for its avoidance. The first section defines a preference; the second section provides for its avoidance. Section 60a, as amended, clearly made the conveyances under consideration, preferences. It would seem that the word 'required' as used in section 60b, in view of the sequence of judicial decision and legislative amendment, should be given a definition which is more liberal than previously was given."

When closely analyzed, there is no conflict between the First National Bank of Lincoln Case, decided by the Circuit Court of Appeals of the Eighth Circuit, and that of the Foltz Case, decided by the Circuit Court of Appeals of the Seventh Circuit.

The effect of the opinion in the First National Bank of Lincoln Case was to hold that a preference, in order to be voidable, must have been a preference at the date of the transfer; that the 1926 amendment changed section 60a (11 USCA § 96 (a), so as to make its definition of a preference conform to section 3b (11 USCA § 21 (b), and did not change section 60b.

The Supreme Court of the United States in Carey v. Donohue, 240 U. S. 430, 36 S. Ct. 386, 389, 60 L. Ed. 726, L. R. A. 1917A, 295, goes to the history of a former effort upon the part of Congress to amend section 60a, as it was amended in 1926, and gives a construction to the amendment which is useful and helpful in this case. In commenting on the Senate's failure to adopt the House amendment, which added the words "or permitted" so as to make section 60 conform to section 3b, the court said: "There is no basis for the assumption that the words which the House of Representatives had desired to add were ultimately deemed to be surplusage, for these words had an obviously distinct significance and they had been included in section 3b, which in this respect remained unchanged. We cannot but regard the action of Congress as a deliberate refusal to conform the requirements of section 60 to those of section 3b, and we are not at liberty to supply by construction what Congress has clearly shown its intention to omit."

Ten years after the rendition of this opinion, Congress responded by supplying the exact words which the Supreme Court in Carey v. Donohue, supra, held were not "surplusage," but had an "obviously distinct significance."

The effect of the opinion in the Foltz Case is to hold that section 60a defines a preference and section 60b defines the method and sets up the machinery for the avoidance thereof.

This same construction of the relation of the two subsections was held in the case of Pirrie v. Chicago Title, etc., Company, 182 U. S. 438, 21 S. Ct. 906, 45 L. Ed. 1171. In Carey v. Donohue, supra, the court repeatedly refers to making section 60 conform to section 3b. The Supreme Court's reference to the section and not the subdivision would indicate a relation between the two subdivisions (a) and (b), such as was construed in the Foltz Case.

The court is of the opinion, under the facts in this case, that at the time of the execution of the mortgage to the Benton County National Bank a preference was given to this creditor of the bankrupt, W. E. Jackson, and that, by reason of the amend-

ment of 1926, the terms of section 60 were so extended as to constitute this a voidable preference, because the same was not filed for record four months before the filing of the petition in bankruptcy against Jackson.

Many points have been raised in the oral argument and in the briefs of counsel, but the court is of the opinion that only the questions dwelt upon in this opinion are pertinent to a consideration of the case.

Therefore the findings of the referee on the mortgages from W. E. Jackson and wife to the Benton County National Bank, W. E. Jackson and wife to R. E. Sharp, trustee, and W. E. Jackson and wife to Chas. N. Mundell and Mrs. E. M. Perry and R. E. Sharp, their trustee, are in all respects sustained and approved.