Zack STAMP, Director of Insurance for the State of Illinois, as Liquidator of Reserve Insurance Company, Plaintiff–Appellant,

v.

INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants–Appellees.

No. 89–1168.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1989.

Decided July 23, 1990.

Jeremiah Marsh, John N. Gavin, Albert C. Maule, David B. Goroff, Hopkins & Sutter, Chicago, Ill., for plaintiff-appellant.

Andrew M. Staub, Ross & Hardies, David M. Spector, Ronald A. Jacks, Thomas S. Kiriakos, Ira J. Belcove, Mayer, Brown & Platt, Peter M. Sfikas, Clay H. Phillips, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., Alan J. Rein, John Mezza Cappa, Mound, Cotton & Wollan, New York City, for defendants-appellees.

John W. Dondanville, Francis D. Morrissey, Thomas A. Doyle, William M. Sneed, John M. Murphy, Baker & McKenzie, Chicago, Ill., for North American Reinsurance Corp., General Reinsurance Corp.

Carole J. Olson, Kansas City, Mo., for amicus curiae Nat. Ass'n of Ins. Com'rs.

John W. Morrison, Charles A. Valente, Altheimer & Gray, Chicago, Ill., Daniel J. Conway, Washington, D.C., for amicus curiae Reinsurance Ass'n of America.

Jonathan F. Bank, Lorraine B. Moura, Buchalter, Nemer, Fields & Younger, San Francisco, Cal., for amicus curiae American Ins. Ass'n, American Council of Life Ins., Nat. Ass'n of Independent Insurers, and Alliance of American Insurers.

Before CUDAHY, EASTERBROOK and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

Bankruptcy in the insurance business has brought us two difficult questions. First is whether amounts the insolvent insurer owes to a reinsurance pool for net losses before the bankruptcy may be set off against amounts the pool owes to the insolvent firm. Second is whether the unearned premiums credited to customers on the cancellation of policies placed with the insolvent firm are voidable preferences and, if they are, who is liable.

## I

The Bankruptcy Code does not apply to insurance companies. 11 U.S.C. § 109(b)(2), (d). Like most other states, Illinois handles the failure of insurers in state court under the supervision of the state's chief regulator, who takes title to the firm's assets as trustee and liquidator. In 1979 the Director of Insurance applied to a state court (the "liquidation court") for an order declaring Reserve Insurance Company insolvent and authorizing him to wind up the firm's business. That order issued on May 29, 1979, and ever since the director as Liquidator has been collecting and paying outstanding claims under the supervision of the state court.

Reserve participated in several reinsurance "treaties". See 622 F.Supp. 611, 613–15 (N.D.Ill.1985). When it wrote a policy covered by one of the treaties (the three in this case concerned petroleum and petrochemical properties), Reserve notified another firm (the Manager) that coordinated the reinsurance pool. The Manager allocated the risk among Reserve and other members of the pool, making entries on the books to indicate percentage ownership of each risk. Similarly, when other firms wrote policies, Reserve would be assigned some of the risk. Each treaty specified the allocation of risks among insurers. The Manager collected the premiums on behalf of the insurers and paid the salesmen or agencies their commissions. The Manager retained the rest of the money to pay claims. Each quarter the Manager would send every member of the pool a statement of accounts: income received from premiums (plus the salvage value of assets the pool acquired when it paid claims), less the amounts disbursed to policyholders. If the pool had net earnings in any quarter, the balance would be distributed to the insurers in proportion to their shares of the risks underwritten. If the pool suffered net losses, the Manager would bill the insurers for the shortfall, again according to their stakes.

The treaties allowed the Manager to place insurance with firms it designated. In early 1979 the Manager concluded that Reserve was in financial difficulty. It cancelled 107 policies written by Reserve and replaced them with policies issued by other members of the pool. A sequence of bookkeeping entries made the transfers.

1. The Manager cancels Reserve's policies and debits Reserve's account for the "unearned premiums"—that is, the amounts customers have prepaid for coverage in days and months ahead. The Manager also cancels the reinsurance of these policies and debits the accounts of the reinsurers for unearned premiums.

2. The unearned premiums are credited to the policyholders' accounts.

3. The Manager uses the credits in the policyholders' accounts to buy new policies from firms other than Reserve.

4. Having purchased new policies for the customers, the Manager reinsures them, usually with the same reinsurers. This reverses the debits in step one for all firms other than Reserve. To the extent that Reserve reinsured policies newly issued by the other firms, it reverses a portion of the debits for Reserve as well.

At the conclusion of the transaction, every customer has the same insurance as before, now from solvent insurers. Most members of the pool carry the same risk, for the same premium, as before, with a slight increase to the extent other insurers absorb Reserve's share. Reserve owes the pool the total of the unearned premiums, less the credits it received as reinsurer of other firms' policies. If the price for the insurance was actuarially correct, Reserve's savings on the reduction in its exposure will approximate the debits for unearned premiums, so there is a wash from its perspective as well as the policyholders' and the other insurers'. ("Approximate" rather than "equal", because Reserve might have made a profit on the business.)

Reserve incurred debts to the pool for 1979 not only because of the cancellation and re-placement of policies but also because the pool suffered net losses on its insurance business for these months. The Manager billed Reserve for the difference.

After the liquidation court declared Reserve insolvent in May 1979, the firm stopped paying its share of losses. Claimants insured under policies that the Manager had not cancelled needed to go to the liquidation court for approval and (part) payment of their losses. Amounts paid directly to the insureds on approval of the court generated debts by the pool to Reserve for the portion of each policy that had been reinsured. The liquidation court also cancelled all of Reserve's remaining policies, generating "unearned premiums" from the reinsurers credited to Reserve's account. (Reserve incurred a corresponding debt to its insureds.) The Manager contended that the pool could set off against these debts to Reserve the amount Reserve owed for net underwriting losses and unearned premiums before it was declared insolvent.

The Liquidator filed this diversity action against the Manager and the other members of the pool. He asked the court to declare that amounts owed to the pool for net losses before May 29 could not be set off against the amount the pool owes for claims that Reserve paid directly after May 29. He also asked the court to direct the Manager to restore to Reserve the unearned premiums on the cancelled policies. Judge Plunkett granted partial summary judgment for the pool on the question of setoff, ruling that the debts were "mutual", and so could be offset, because both debts represented sums due on casualties policyholders suffered before May 29. That some of the claims had been liquidated before May 29, while others were paid later, did not destroy the contemporaneous nature of the debts. 622 F.Supp. at 618–19.

With respect to the cancellation of the policies, Judge Plunkett first concluded that the Manager had authority under the treaties to proceed as it did. 622 F.Supp. at 620. Then the court concluded that the cancellation was not a voidable preference, because it was not a payment of an antecedent debt. *Id.* at 620–22. The Liquidator asked Judge Duff, to whom the case was transferred, to reconsider. Judge Duff disagreed with Judge Plunkett's rea-

soning in some particulars but concluded that his disposition of the Liquidator's claims is correct. 668 F.Supp. 1183 (N.D. Ill.1987). The principal difference between the opinions is that Judge Duff concluded that the unearned premiums were a debt, but that the debits were not preferences because Reserve got a contemporaneous exchange of equal value—release from its obligation to pay in the event a policyholder suffered a casualty. The parties then stipulated to the size of their claims and to a complex judgment effecting the netting. In the end, the court directed the pool to pay the Liquidator $201,677.

II

We begin with the question whether the district court had subject-matter jurisdiction to determine and set off the amount that Reserve owed to the pool for net losses before May 29, 1979. According to the Liquidator, a setoff is just like ordering Reserve to pay a claim. Only the liquidation court may do that. The upshot, the Liquidator believes, is that the district judge may (and must) require the pool to pay Reserve, but may not require Reserve to pay the pool even indirectly by recognizing a setoff. For this proposition the Liquidator relies on *Thacher v. H.C. Baldwin Agency, Inc.*, 283 F.2d 857 (7th Cir.1960).

We may assume that the district judge could not have directed the Liquidator to pay anything to the reinsurers. That is not, however, what happened. The net judgment runs in favor of the Liquidator. The only question is whether, in determining how much the pool owes the Liquidator, the district court may consider how much Reserve owed the pool. *Thacher* affirms the decision of a district court not to recognize a setoff against an insurer in liquidation. Although the Liquidator says that *Thacher* held that a federal court lacks jurisdiction to recognize a setoff, the case does not use the language of jurisdiction. *Thacher* does not explain either why the district court ruled as it did, or on what basis it was being affirmed. It may be that the liquidation court in *Thacher* had

issued an order, binding *in personam* on the party asserting the setoff, requiring the consolidation of claims in the state forum. No such order runs against the reinsurers. We are confident, at all events, that *Thacher* is not about "jurisdiction", for the simple reason that no state may obliterate the diversity jurisdiction of a district court by claiming "exclusive" authority over a subject. Federal laws preempt state laws, not the other way 'round. See *Kendra Oil & Gas, Inc. v. Homco Ltd.*, 879 F.2d 240, 242 (7th Cir.1989).

◼ The question properly is one of abstention under *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). When a state establishes a forum for consolidated proceedings involving a complex of related questions, a federal court sensibly stays its hand to allow the state to resolve all related questions in one go. *Colorado River* abstention hardly is appropriate here, however, for the Liquidator himself came to federal court, ensuring that the affairs of Reserve will *not* be wound up in a single forum. All parties agree, moreover, that the liquidation court in Illinois lacks the ancillary jurisdiction that a federal bankruptcy court possesses, so that the liquidation court does not offer a forum in which all questions concerning Reserve may be settled. In particular, the liquidation court could not entertain the Liquidator's attempt to collect from the pool for payments Reserve made direct to its insureds. *Colorado River* abstention is therefore inappropriate, and because the diversity jurisdiction supplies ample adjudicatory power, the district court was entitled to decide the setoff question. *Central States Health and Welfare Fund v. Old Security Life Insurance Co.*, 600 F.2d 671, 674 (7th Cir.1979).

Before taking up the merits, one related matter. The Liquidator asks us to certify to the Supreme Court of Illinois those questions of state law resolved adversely to him by the district court. This is a curious request. Why should a state official invoke federal jurisdiction, only to turn around and ask us to obtain the state court's opinion? Although the Liquidator had to move outside the liquidation court to collect from the reinsurers, he could have selected a state court of general jurisdiction. All of the questions in this case arise under Illinois law. Illinois's long-arm statute would have enabled the Liquidator to obtain personal jurisdiction over the defendants. It was, indeed, the state's long-arm statute that provided the basis for personal jurisdiction in federal court, see Fed.R. Civ.P. 4(e). We are not sympathetic to plaintiffs who opt for a federal forum, lose, and then want a second opinion from a state court. See *Chang v. Michiana Telecasting Corp.*, 900 F.2d 1085, 1087–88 (7th Cir.1990). The motion to certify questions to the Supreme Court of Illinois is denied.

### III

Illinois, whose law governs Reserve's liquidation, allows setoffs:

> In all cases of mutual debts or mutual credits between the [insolvent insurance] company and another person, such credits and debts shall be set off and the balance only shall be allowed or paid....

Ill.Rev.Stat. ch. 73 ¶ 818. The fundamental question is whether the debts are "mutual". Illinois's statute, enacted in 1937, is modeled after the federal Bankruptcy Act of 1898, so we follow the state's lead, see *People ex rel. Gerber v. Central Casualty Co.*, 37 Ill.2d 392, 397–99, 226 N.E.2d 862, 865–66 (1967); *In re Security Casualty Co.*, 127 Ill.2d 434, 451–52, 130 Ill.Dec. 446, 454–55, 537 N.E.2d 775, 783–84 (1989), in drawing on federal bankruptcy law, although in Part IV we shall have to distinguish the 1898 Act from the 1978 Code. For immediate purposes there is no difference.

◼ "Mutual" in bankruptcy law means contemporaneous and in the same capacity. E.g., *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 564–66 (7th Cir.1986) (collecting sources); *Standard Oil Co. v. Elliott*, 80 F.2d 158 (4th Cir. 1935). Cf. *In re Iowa R.R.*, 840 F.2d 535 (7th Cir.1988). Bankruptcy draws a sharp line on the date of filing: pre-bankruptcy debts may be offset, but for reasons elabo-

rated in *Boston & Maine* a pre-bankruptcy debt may not be offset against a debt arising after the filing.

■ The reinsurers say that the debts are mutual because they arose out of transactions before May 29, 1979, and the parties owe money to each other in their capacity as members of the pool. Mutuality, according to the reinsurers, depends on the date of the events giving rise to the liability and the fact that all debts are owed in the insurers' capacity as members of the pool. The Liquidator responds that Reserve did not "owe" anything until the court approved payment. Reserve's payments (and the pool's debts to Reserve) then are post-bankruptcy debts, which may not be offset against the pre-bankruptcy debt from Reserve to the pool.

The reinsurers have the better of this argument. Illinois treats an insurer's commitments on pre-bankruptcy casualties as pre-bankruptcy debts. The liquidation court wrote down claims on account of pre-bankruptcy casualties to reflect their status as debts outstanding on the date of bankruptcy. Although these debts were liquidated during bankruptcy, ¶ 818 requires "mutuality" of obligation rather than identity of the time of payment. A debt may exist even though it has not been valued conclusively and even though there is a bona fide dispute about the obligation to pay. E.g., *Art Press, Ltd. v. Western Printing Machinery Co.*, 852 F.2d 276, 278–80 (7th Cir.1988) (Illinois law). This is the usual understanding about mutuality. See 4 *Collier on Bankruptcy* ¶ 68.10[2] (L. King 14th ed. 1977): "The right of set-off may be asserted in the bankruptcy proceedings even though at the time the petition is filed one of the debts involved is absolutely owing but not presently due, or where a definite liability has accrued but is as yet unliquidated." See *Scott v. Armstrong*, 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059 (1892); *Carr v. Hamilton*, 129 U.S. 252, 9 S.Ct. 295, 32 L.Ed. 669 (1889); *Scammon v. Kimball*, 92 U.S. 362, 23 L.Ed. 483 (1876). California recently applied this principle to hold that debts on account of transactions within a reinsurance pool are mutual.

*Prudential Reinsurance Co. v. Superior Court*, 216 Cal.App.3d 1321, 265 Cal.Rptr. 386 (2d Dist.1989), review granted, 268 Cal. Rptr. 542, 789 P.2d 342 (1990).

To the extent there is doubt under existing cases, we predict that the Supreme Court of Illinois would treat these debts as mutual. The Liquidator maintains that Illinois uses its insolvency rules to protect policyholders. If so, then Illinois must protect the integrity of reinsurance pools, which spread risk more effectively and so yield great benefits for policyholders. Reinsurance pools, like the interline balances involved in *Boston & Maine* and *Iowa R.R.*, are setoff devices from the start. It would hamper the utility of reinsurance pools, and so increase the cost of insurance, if bankruptcy not only carved a pool into pre- and post-filing portions but also broke up the offset for casualties occurring before the filing. Offsetting debts in a reinsurance pool not only spreads risk but also acts as mutual security for performance. Such security is especially important for smaller insurers; if the large firms could not count on the netting of balances to satisfy obligations, they would be more likely to exclude smaller or tottering firms—making new entry harder and precipitating failures of firms in difficulty. With a mutual offset inside the pool, each party's desire to realize on its own claims against the pool gives it an incentive to keep the pool going. Cf. Oliver E. Williamson, *Credible Commitments: Using Hostages to Support Exchange*, 73 Am.Econ. Rev. 519 (1983). If the instant one member fails the other members' exposure becomes the gross rather than the net obligation, then the mutual security of the offsetting debts is destroyed. Pools become less useful; the premium charged to bear risk will rise.

Consider an illustration. Suppose that the Manager had computed that for January through May 29, 1979, the pool owed Reserve $10 million in premiums on Reserve's policies, and Reserve owed the pool $10 million for casualties on its policies (net of salvage). The manager would declare the account even. If the Liquidator's position is correct, however, then, if the Man-

ager sent the notice on May 30, quantifying the claims *after* the filing in state court, Reserve would be entitled to $10 million in cash (pre-bankruptcy income) and the $10 million in casualty losses would become a debt of Reserve to the pool, to be paid only in such part as the liquidation court approved. The Liquidator does not press his position to this extreme, but the principle is the same. If pre-bankruptcy receipts and casualties may be offset inside the reinsurance pool, then ¶ 818 allows the same set-off outside the pool. These debts are "mutual" because the claims in each direction represent premiums and casualties before May 29, 1979. Given this conclusion we need not decide whether ¶ 818 displaces principles of common law recoupment, and whether recoupment would have been available in this situation.

## IV

■ The Liquidator attacks the Manager's cancellation of the 107 policies on two fronts: he submits that the Manager lacked the authority to effect a "mass cancellation", and that if the Manager had such authority the unearned premium is a voidable preference that the debtor's estate may recover.

### A

The reinsurance treaty provides:

The Manager shall ... have the authority, at its sole discretion, to replace at any time the policy of one Ceding Company with the policy of another by novation, reinsurance or assumption.

The Manager relies on this as the source of authority to cancel Reserve's policies. The language is straightforward; we agree with the district court that it authorizes the Manager's acts. See *Downey v. Humphreys*, 102 Cal.App.2d 323, 227 P.2d 484 (2d Dist.1951). Other cases, on which the Liquidator relies, do not involve such express language.

The Liquidator allows that cancellation of a policy or two might have been alright, but he insists that a "mass" cancellation violates the public policy of Illinois. "Public policy" is a nebulous basis on which to refuse to enforce a contract, and courts accordingly insist on clearly articulated and overriding statements of policy. Although the Liquidator contends that Illinois has a "policy" favoring insureds in the event of insolvency, this policy (like every other) has limits. We may not assume that because a policy exists, it is always appropriate to achieve "more" by overriding contracts. At all events, favoring insureds does not call for reversing the cancellation and replacement of the insurance. After all, the Manager furnished the holders of these 107 policies with solvent insurers. These 107 were unambiguously better off as a result of the transactions.

The only well-articulated policy pertinent here is the one against preferential transfers by insolvent insurers. Benefits to the "gang of 107" may have come at some cost to other policyholders. Rules about preferential transfers do not, however, deny the existence of authority to make the transfer in the first place; they suppose that such authority exists and then undo the transfer. Perhaps these transfers must be undone, but that depends on application of the rules about preferences rather than on smuggling some simulacrum of these rules through the back door.

### B

Like federal bankruptcy law, the Illinois statute governing the liquidation of insurers provides for the recovery of preferential transfers. See Ill.Rev.Stat. ch. 73 ¶ 816:

(2) Any transfer of, or lien upon, any property of any company made or created within four months prior to the filing of a complaint under this article, which gives to any creditor or policyholder or enables him to obtain a greater percentage of his debt than any other creditor or policyholder in the same class, which is accepted by a creditor or policyholder having reasonable cause to believe that such a preference will occur, shall be voidable....

(3) Every ... person receiving any property of, or cash surrender from, such

company or the benefit thereof, as a result of a transaction voidable under subsection (2) shall be jointly and severally liable therefor and shall be bound to account to the Director as ... Liquidator....

Subsection (2) defines a voidable transaction as the payment (i) of a debt, so that (ii) the recipient obtains a greater percentage than others of the class. (There are also time and mental state requirements, which we disregard.) Subsection (3) identifies the persons who may be required to return the preference: those who received the property or obtained the benefit of it. All three elements are contested. Judge Plunkett stopped the contest in round (i), holding that the transfers were not on account of Reserve's debts. Judge Duff disagreed with Judge Plunkett on this question but held that the cancellation of the policies meant that there was no preference. We disagree with both of these conclusions but hold that the Liquidator is not entitled to recover anything from the Manager or reinsurers, who did not receive the transfers or their benefit.

■ 1. Unearned premiums are contingent liabilities. An insured may cancel the policy and demand that the insurer return the premium prepaid for days of coverage that lie ahead. Even though the insurer does not owe money to the insured until a casualty occurs or the insured cancels the policy, a contingent liability is enough to make unearned premiums "debts" under the 1978 Code. See 11 U.S.C. § 101(11), defining a debt as liability on a "claim", and § 101(4)(A), defining a "claim" as any right to payment, whether or not contingent or liquidated. A policyholder has a "claim" against an insurer for unearned premiums, which are therefore the insurer's "debts". See also, e.g., *Pennsylvania Department of Welfare v. Davenport*, — U.S. ——, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186, 1190 (7th Cir.1989); *In re Energy Cooperative, Inc.*, 832 F.2d 997, 1001 (7th Cir.1987), discussing the broad meaning of claim and debt under the 1978 Code.

Illinois did not define "debt" in its insurance code. The reinsurers insist that back in 1937, when Illinois enacted ¶ 816, "debt" was a much more confined term, representing only liabilities due and owing. Because insurers do not owe the unearned premium until after cancellation, it cannot be a debt. We assume that Illinois would look to cases under the 1898 Act, rather than the 1978 Code, when searching for guidance.* Still, the reinsurers' argument proves too much. On their approach, a demand note would not be a "debt" until demand had been made. Yet notes were debts under the 1898 Act whether or not the sums were due before insolvency. *City National Bank v. Bruce*, 109 F. 69 (4th Cir.1901).

■ Section 63(a)(4) of the 1898 Act defined as debts any sums due on open account, or "upon a contract express or implied". Unearned premiums are due by virtue of contract, if future coverage is cancelled. That the obligation is not liquidated until demand does not make the obligation less a debt. Under the 1898 Act, damages for breaches of contract and torts committed in the course of fiduciary relationships were treated as debts even though the obligation was not liquidated until after the petition in bankruptcy. See *Clarke v. Rogers*, 228 U.S. 534, 542–44, 33 S.Ct. 587, 588–89, 57 L.Ed. 953 (1913); *Grant Shoe Co. v. Laird*, 212 U.S. 445, 29 S.Ct. 332, 53 L.Ed. 591 (1909); *Tindle v.*

---

* Curiously the Liquidator, who stoutly insisted when discussing setoffs that the meaning of state law was fixed in 1937 despite the transformation of federal bankruptcy law, relies heavily on the 1978 Code when discussing preferences, disparaging the argument that "interpretation of Illinois law must remain frozen in 1937, when only the Bankruptcy Act of 1898 existed. Defendants offer no statutory or judicial authority that the interpretation of Illinois law is to be so rigid." Reply Br. 12. The Liquidator offers no authority for his own view that state law follows the 1978 Code, a thorough rewrite of the language of the 1898 Act that Illinois has not copied. We think it likely that the Supreme Court of Illinois would look to precedents under the 1898 Act rather than the 1978 Code when interpreting the state's 1937 statute. But for reasons that we discuss below, if we were to decide the case as if the 1978 Code were in force in Illinois, 11 U.S.C. § 550(b)(1) would be a "stopper" to the Liquidator's position.

*Birkett,* 205 U.S. 183, 186, 27 S.Ct. 493, 494, 51 L.Ed. 762 (1907); *Crawford v. Burke,* 195 U.S. 176, 187, 25 S.Ct. 9, 11, 49 L.Ed. 147 (1904). Unearned premiums have some qualities of demand notes and some qualities of prepaid rent (which must be returned if the tenant vacates ·without breaching the lease). Or we may conceive of the insurer as holding a deposit, which it will apply each day to "buy" new insurance. Until the day arrives, the fund is a "debt" of the insurer to the policyholder.

2. The reinsurers press this last characterization—unearned premium as a fund applied daily by the insurer to buy another increment of coverage—as the basis of an argument that the policyholders did not get a preference compared with Reserve's other creditors. As the reinsurers depict things, the clients simply elected not to buy additional insurance from Reserve. Persons who bought six months of insurance ending on June 30 got more of what they paid for than did persons whose policies ran until December 31. The difference is no more a "preference" than is the fact that a customer who engages in a cash-and-carry transaction with a retailer the day before bankruptcy does better than one who sends in money and waits for merchandise that, because of the insolvency, may never come. So here, the reinsurers insist, the Manager cleverly arranged for the policyholders to buy less insurance from Reserve, and the smaller purchase cannot be a preference.

This way of looking at things supposes that the prepaid premium sits in trust for the policyholder, and that the Manager or insurer decides every day whether to use the fund to buy an increment of insurance from Reserve or from someone else. Such a characterization might be plausible if there were an identifiable *res,* but there is not. No funds are segregated. Prepaid premiums are commingled and used by the Manager and insurers to satisfy general obligations. It is not possible, see *In re Iowa R.R.,* to treat them *ex post* as if they were trust funds. Reserve was not holding "the policyholders' money"; it owed them debts.

Cases such as *In re Iowa Premium Service, Inc.,* 695 F.2d 1109 (8th Cir.1982) (in banc), deal with different kinds of transactions. *Iowa Premium Service* holds that daily payment of interest on a note is not a preferential transfer because the interest accrues daily; pay-as-you-go does not prefer one creditor over another. Although *Iowa Premium Service* spoke in the terms of the debts for interest not existing until the day came and went (the fund generated income from which the payments of interest could be made), we prefer to characterize the problem as one of defining payments in the ordinary course of business, which are not treated as preferences under the 1978 Code. Either way, *Iowa Premium Service* is no help to the reinsurers. The cancellation of the 107 policies was not in the ordinary course of business, and the unearned premiums were existing debts rather than sums generated by ongoing transactions.

This leaves us with Judge Duff's conclusion that Reserve's policyholders did not receive a preference because they gave contemporaneous value in the form of cancelling Reserve's obligation to indemnify them for losses. If the policies were priced correctly, then the unearned premium matched the value of the obligation to indemnify. An even-up exchange cannot be a preference, Judge Duff concluded.

Unfortunately, the exchange was not even if Reserve was insolvent at the time. An example makes the point. Pumpkins Galore offers a plan under which, for $60 paid in January, it will deliver one pumpkin per month to a customer for the year. Each pumpkin is worth $5 (ignoring the time value of money). Come December, Pumpkins Galore discovers that although it has $5,000 on hand (enough to send out 1,000 pumpkins), it has 2,000 subscribers. If Pumpkins Galore mailed $5 checks to 1,000 of its customers, "cancelling" the obligation to send the December pumpkin, these 1,000 customers would perceive the exchange as even. Nonetheless the payment would prefer these customers over the others. They would get full value; the remaining 1,000 customers would get nothing. A trustee in bankruptcy could recover

the $5 from each customer, redistributing $2.50 to all (assuming that the firm had no other debts). So too with insurance. The 107 persons whose policies the Manager cancelled and replaced got 100¢ on the dollar. Other policies were cancelled by operation of law on May 29, 1979, and claims to unpaid premiums became unsecured debts of Reserve. Persons whose policies were in force on May 29 received less per dollar of unearned premium than did the fortunate 107. This difference makes the payment a preference within the scope of ¶ 816(2).

3. The cancellation and re-placement of the policies proceeded in stages. First the Manager debited Reserve and credited the customers. Next the Manager used the credits to buy new policies for the customers. Finally the Manager re-insured portions of the risks under these new policies, in most cases using the same firms that had reinsured Reserve's policies. Reserve's policyholders received the initial transfer. They also obtained the benefit of the process, for reasons explained immediately above. (The fortunate 107 policyholders got 100¢ on the dollar for unearned premiums, far more than was returned to persons whose policies were in force on May 29.) Because ¶ 816(3) allows the Liquidator to recover the preference from any "person receiving any property of, or cash surrender from, such [insolvent] company or the benefit thereof", the policyholders are the logical persons to cough up the money. The Liquidator did not sue the policyholders. Instead he asks the Manager and the reinsurers to return the sums.

It is hard to see how either qualifies as a person "receiving" the property. The Manager did not obtain dominion over the cash value of the unearned premiums but acted on behalf of the reinsurers and the policyholders. None of the money was credited to the Manager's account, and the Manager could not use the proceeds to satisfy its own debts. It no more "received" the money than does an armored car that moves specie from one bank to another. See generally *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893–96 (7th Cir.1988), discussing the identi-

fication of the transferee under the preference-recovery sections of the 1978 Code. Drawing on precedents under the 1898 Act (and so informative here too), we concluded that "[w]hen A gives a check to B as agent for C, then C is the 'initial transferee' ", 838 F.2d at 893. In our case, A is Reserve, B is the Manager, and C is the policyholder.

The underwriters of the replacement policies at least received the credits, but only indirectly: they came through the accounts of the policyholders. At every stage, the policyholders exercised dominion over these funds. Anyone who did not agree with the Manager's actions could have cancelled the new policy and received the unearned premiums, using them to buy insurance from an underwriter of its choice, or to pay for a trek in Tibet. Indirect or second-stage transferees are exposed to recovery under § 550(a)(2) of the 1978 Code, but there is no comparable provision in Illinois law. Moreover, even under the 1978 Code, preferences may not be recovered from secondary transferees that take for value, see § 550(b)(1). Underwriting or reinsuring a policy is value, so the issuers of the new policies are protected under federal law. Even if a provision such as § 550(a)(2) were read into Illinois law by the common law process, a court would also read in a for-value exception.

The Liquidator does not argue that the Manager and the members of the pool are "transferees" so much as that they got the "benefit" of the transfer. How?, one may ask. Before the cancellation and replacement of these policies, the pool bore the risk through reinsurance; after the transaction, it bore the same risk for the same price. Policyholders undoubtedly appreciated the substitution of solvent insurers for the troubled Reserve, but this is not a benefit to the pool.

Or is it? The Liquidator insists that it is, because the pool's reputation will be enhanced if it assures customers of full payment on claims. Petrochemical firms needing insurance will be more likely to do business with members of the pool in the future if they are confident that the pool will protect their interests. Although this

is a clever turn, it has no support in cases under the 1898 Act or state provisions parallel to ¶ 816(3).

Section 60(b) of the 1898 Act had "benefit" language similar to ¶ 816(3). Courts regularly understood the "benefit" of repayment as going to one secondarily liable on the debt. For example, payment to the lender produces a "benefit" for a guarantor, who would have had to pay in the debtor's stead. E.g., *National Bank of Newport v. National Herkimer Bank*, 225 U.S. 178, 184, 32 S.Ct. 633, 635, 56 L.Ed. 1042 (1912); *Huntington v. Baskerville*, 192 F. 813 (8th Cir.1911); *Smith v. Tostevin*, 247 F. 102 (2d Cir.1917) (L. Hand, J.). See also *Ingersoll Rand*, 874 F.2d at 1190, 1194–96 (1978 Code). Sureties, indorsers, and other persons conditionally liable also receive benefits from payment of the debt. If called on to pay, guarantors and the like would have been creditors; the "benefit" to them is that extinguishing the primary debt means that they receive a larger percentage of their claim than they would have had they paid and been converted to general creditors of the bankrupt. Cases under the 1898 Act routinely held that unless a person escapes an obligation to pay and so reaps a larger portion of his claim than do other creditors, he has not received a statutory "benefit". E.g., *Mayes v. Palmer*, 208 F. 97 (8th Cir.1913); *Walker v. Wilkinson*, 296 F. 850 (5th Cir.1924); *Mansfield Lumber Co. v. Sternberg*, 38 F.2d 614 (8th Cir.1930). See also *Bonded Financial*, 838 F.2d at 895–96 (holding that transferee and beneficiary are mutually exclusive categories). The Liquidator has not identified, and we could not find, any case holding that an increased probability of repeat business from a customer unaffiliated with the bankrupt is a "benefit" that must be returned to the debtor's estate.

In the end, then, the Liquidator must lose despite having a sound theory that the transfers on the eve of Reserve's insolvency were voidable preferences (if the recipients had the necessary knowledge, a subject we have not broached). The Liquidator has not pursued the policyholders—whether because their presence would destroy diversity jurisdiction, or because he despairs of ability to show that they had "reasonable cause to believe" that the transactions were preferential, the record does not reveal. No matter. We are confident that the Manager (which never received the money) and the other members of the pool (which gave value for the premiums) are not obliged to return the premiums on Reserve's cancelled policies. The policyholders themselves received the preferences, and they are the only ones liable to return them.

AFFIRMED.