In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1886

Reliance Insurance Company,

Plaintiff-Appellant,

v.

Shriver, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 5211--Rubin Castillo, Judge.

Argued January 19, 2000--Decided August 14, 2000

Before Bauer, Cudahy and Evans, Circuit Judges.

Cudahy, Circuit Judge.  Reliance Insurance
Company sued Shriver, Inc., alleging that Shriver
owed it premiums on various insurance policies
issued in 1997. These policies were issued by
Reliance but were completely reinsured and
administered by a member of the Home State
Insurance Group, Quaker City./1 Shriver had
acted as Home State's agent during the issuance
of the policies to two trucking companies in
Illinois and was to collect the premiums from the
insureds. The district court denied a motion for
summary judgment filed by Reliance. Shriver then
filed its own motion for summary judgment,
arguing that it had rightfully set off the
premiums on the Reliance policies against premium
refunds (from canceled policies) owed to it by
Home State. The district court granted Shriver's
motion. Reliance now appeals.

This case arises in connection with insurance
policies issued to Robinson Bus Service, Inc.,
and to White Transportation through Shriver. In
September of 1996, Shriver, acting pursuant to
its agency agreement with the Home State
Insurance Group and as insurance broker to
Robinson and White, collected the full premiums
for these one-year policies. These premiums were
then forwarded by Shriver to Home State pursuant
to their agency agreement. Both Robinson and

White conducted their businesses in Illinois, but Home State was not licensed to issue insurance policies directly in Illinois. Home State, therefore, had to use what is known as a "fronting arrangement" to insure these Illinois risks. In a fronting arrangement--a well-established and perfectly legal scheme--policies are issued by a state-licensed insurance company and then immediately reinsured to 100 percent of their face value by the out-of-state, unlicensed insurer./2 In a typical fronting arrangement, the fronting insurer issues policies on its own paper and in its own name, and the out-of-state unlicensed insurer takes over the administration of all claims as part of the reinsurance agreement. The original policies issued to Robinson and White in September of 1996 (the 1996 policies) were fronted by Security Insurance Company of Hartford (Hartford), an Illinois-licensed insurance company, and reinsured by Home State. As was typical of this kind of arrangement, Hartford, as a fronting fee, earned a small percentage of the premiums in exchange for issuing the policy documents, while the bulk of the premiums ended up with Home State for underwriting 100 percent of the risk.

Robinson's and White's 1996 policies were one-year policies and were intended to remain in effect through September of 1997. Between September of 1996 and the Spring of 1997, however, Home State had very favorable claims experience with respect to the 1996 policies. Robinson and White were good customers, and because Home State feared a competitor would offer the trucking companies a lower rate at the end of the policy period, Home State took steps to retain their business. First, Home State canceled the 1996 policies mid-term. Second, Home State issued both Robinson and White replacement policies (the 1997 replacement policies) at lower rates./3 These new policies also had to be fronted, and the 1997 replacement policies were issued by Reliance, under a typical fronting arrangement with Home State. There was no relationship between Reliance and Hartford (which had fronted the 1996 policies), and as before, Shriver served Robinson and White by acting as an agent and broker for Home State.

Robinson and White were issued the 1997 replacement policies with one-year coverage on Reliance's own paper, and Home State reinsured 100 percent of the risk on these policies. Home State and Reliance established this fronting arrangement for the 1997 replacement policies in a contract known as a "facultative reinsurance agreement" between Reliance and Quaker City. Under the reinsurance agreement, Reliance designated Quaker City as its agent for

collecting premiums and ceded administration of the 1997 replacement policies to Quaker City. The Quaker City-Reliance agreement did not address Home State's relationship with Shriver--nor did it establish a relationship between Reliance and Shriver. Under the Home State-Shriver agency agreement, Shriver was to collect premiums from Robinson and White for the 1997 replacement policies and pay them to Home State. Then, under its agreement with Reliance, Home State was to deposit the premiums in a bank account over which Reliance had sole control. Once the money was deposited, Reliance would keep its small fronting commission for writing the policies and would transfer the bulk of the collected money--as Home State's reinsurance premium--to a premium trust account. Home State could access this account only for specific purposes related to the administration of the policies./4

The new 1997 replacement policies were issued, but there remained some administrative clean-up with respect to the canceled 1996 policies. Robinson and White had paid premiums to Shriver for the full term on the 1996 policies, but because those policies had been canceled early, the trucking companies had functionally overpaid Shriver for four months worth of premiums-- totaling approximately $259,000./5 (The amount of this overpayment is known in the insurance industry as "unearned premiums." They are called "unearned" because they are premium payments for days of coverage in the future, and if the policy is canceled, the unearned premiums are returned to the insureds.) Shriver had already paid the full premiums from the 1996 policies over to Home State. So Shriver had also overpaid Home State, again by $259,000. Shriver received the invoice from Home State for the premiums on the 1997 replacement policies, and on July 21, 1997, Shriver set off the amount that it had overpaid on the canceled 1996 policies against the amount it owed to Home State on the 1997 replacement policies. Shriver also credited this amount to Robinson and White, and on August 11, 1997, Shriver received the current balance due for the 1997 replacement policies from Robinson and White. These payments reflected the $259,000 credit from Shriver.

But, by June of 1997, it started to become clear that Home State was in serious financial trouble. Quaker City was being monitored by the Pennsylvania Department of Insurance, and other companies of the Home State Insurance Group were being monitored by the insurance regulators in other states. Concerned that Home State/6 might not be able to fulfill its reinsurance obligations on the 1997 replacement policies (thus leaving Reliance liable with nowhere to

collect reinsurance money), Reliance met with the Pennsylvania Department of Insurance on August 8, 1997, seeking permission to replace Quaker City (and thereby remove Home State) as the administrator of the Reliance-fronted policies. The Department agreed, and on August 12, 1997, Reliance informed Shriver that it was taking over policy administration and that all "current and future premium payments" should be sent directly to Reliance. Prior to this communication, Shriver had never dealt directly with Reliance, but after receiving the letter, Shriver remitted all subsequent premiums it collected from Robinson and White directly to Reliance--including the payment it had received from the insureds on August 11. However, because it believed that it had already set off the unearned premiums on the 1996 policies (which it had earlier overpaid) against what it owed Home State on the 1997 replacement policies, Shriver's payments to Reliance were decreased to reflect the $259,000 set-off. Reliance was not pleased.

Throughout the term of the 1997 replacement policies, Reliance maintained coverage but argued with Shriver over the $259,000. Reliance maintained that Shriver owed that money to Reliance, but Shriver did not agree. Shriver continued to remit all additional premiums it collected after August 12, 1997, to Reliance precisely as Reliance wanted. In an attempt to force Shriver to pay the disputed money, Reliance sent Shriver a "Broker Agreement" on December 18, 1997. This agreement purported to create a retroactive agency relationship between Reliance and Shriver, thereby obligating Shriver to pay the set-off amount to Reliance. Shriver did not execute the proposed agreement.

Following the end of the 1997 replacement policy period, Reliance brought this lawsuit against Shriver in an attempt to recover the money Shriver claims to have set off against Home State. On March 11, 1999, the district court granted summary judgment in favor of Shriver on the ground that Shriver was entitled to the set-off under Illinois law. Reliance appeals.

We review the district court's decision to grant summary judgment in favor of Shriver de novo. See Hostetler v. Quality Dining, Inc., No. 98-2386, 2000 WL 862482, at *5 (7th Cir. June 29, 2000). Summary judgment is appropriate if, construing the record in the light most favorable to Reliance, "there is no genuine issue as to any material fact" and Shriver "is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Hostetler, 2000 WL 862482, at *5. Reliance makes two arguments on appeal. First, it claims that, under Illinois insurance law,

Shriver had a statutory duty to remit to Reliance all premiums collected on policies issued by Reliance. Second, Reliance argues that Shriver was not entitled to set off the 1996 policy overpayments against the 1997 replacement policy premiums. We address each in turn.

I.  Duty to Remit Premiums

Reliance begins its argument with the proposition that, as an insurer, it is entitled to the payment of premiums in consideration for providing insurance coverage under the policies it issues. This is a sound proposition as a general matter, and it is undisputed that Shriver dutifully paid collected premiums to Reliance after August 12, 1997, when Reliance notified Shriver that it was taking over administration of the 1997 replacement policies. Although Shriver's duty to pay premiums after August 12, 1997, (and its compliance with that duty) is undisputed, the parties hotly dispute whether Shriver owed a similar duty to Reliance before that date. Shriver claims that it had no duty to pay anything to Reliance prior to August 12, 1997. Its duty before this date, argues Shriver, was to Home State and Home State only. Therefore, Shriver concludes that it validly set off the $259,000 against its debt to Home State prior to August 12, 1997. Reliance, however, counters by arguing that Shriver was not entitled to set off because Shriver was compelled by statute to pay all collected premiums--even those collected before August 12, 1997--directly to Reliance.

Reliance finds the source of this alleged duty in the Illinois Insurance Code at 215 Ill. Comp. Stat. 5/508.1, which states in pertinent part:

Any money which an insurance producer . . . receives for . . . policies of insurance shall be held in a fiduciary capacity, and shall not be misappropriated, converted or improperly withheld. Any insurance company which delivers to any insurance producer in this State a policy or contract for insurance pursuant to the application or request of an insurance producer, authorizes such producer to collect or receive on its behalf payment of any premium which is due on such policy or contract for insurance . . . .

215 Ill. Comp. Stat. 5/508.1. Reliance argues, at least in one part of its brief, that Shriver's set-off of the $259,000 of unearned premiums from the 1996 policies against the 1997 replacement policy premiums constituted misappropriation, conversion or improper withholding under sec. 5/508.1. But Reliance's argument overlooks the contractual arrangement that governed the issuance of policies and the collection of

premiums. Recall that under the agreements in effect prior to August 12, 1997, premiums flowed from the insureds to Shriver, then to Home State, then to Reliance (and then back to Home State, minus Reliance's fronting commission). Reliance is trying to use sec. 5/508.1 to overlook this arrangement and create a duty flowing directly from Shriver to Reliance. But case law interpreting sec. 5/508.1 indicates that an insurer and agent can vary the premium-collection procedure by contract. See Scott v. Assurance Co. of America, 625 N.E.2d 439, 442 (Ill. App. Ct. 1993) (explaining that sec. 5/508.1 was not meant to "prohibit[ ] an insurer from determining the billing procedure to be used" because "the effect would be drastic and no indication of such an interpretation has been called to our attention")./7 The premium-collection procedures here were arranged by contract, Reliance entered into that contractual scheme, and it presents no reason why it should not be held to its agreement. The contracts here provided that Home State, not Shriver, was Reliance's agent for the collection of insurance premiums. Under the contracts, Shriver was to pay Home State and Home State was, in turn, to pay Reliance. Had Reliance wanted a direct relationship with Shriver, it could have created one./8 But, although Reliance may not be happy about it now, there was no direct relationship between Reliance and Shriver prior to the letter of August 12, 1997--nor does sec. 5/508.1 create such a duty independent of the contractual arrangements among the parties here. Cf. Scott, 625 N.E.2d at 442.

Later in its brief, however, Reliance apparently acknowledges that the contractual obligations defined the duties among Reliance, Home State and Shriver prior to August 12, 1997:

[Home State]'s only entitlement to those premiums stems from Reliance's appointment of [Home State] as its agent for collecting them. Thus, as long as [Home State] was authorized to act as Reliance's agent for collection of premiums, Shriver's duty to remit the premiums from the Robinson and White policies would have been satisfied by remitting those premiums to [Home State]; and Reliance would not be entitled to now recover any premiums on the Robinson and White policies that Shriver had paid to [Home State] prior to August 12, 1997 (when Reliance revoked [Home State]'s authority to collect those premiums on its behalf).

Appellant's Br. at 11 (emphasis added). Home State was Reliance's agent for collection of premiums until August 12, when Reliance revoked Home State's authority. If Shriver's set-off was valid (a point we shall address momentarily), it

took place during the period when Reliance concedes that Shriver had authority to pay premiums to Home State. Reliance tries to avoid the overwhelming import of this concession by arguing that "[h]owever, Shriver did not pay any of the premium for the Robinson and White policies to [Home State] either before, or for that matter, after, August 12, 1997." Id. By so arguing, Reliance is saying that setting off the debt Home State owed to it against the debt it owed to Home State, Shriver did not "pay" its debt to Home State--ever. But to argue that set-off is not a form of "payment" is clearly incorrect. Set-off is a means of (or substitute for) payment of mutual debts owed, see 215 Ill. Comp. Stat. 5/206 ("such credits and debts shall be set off or counterclaimed and the balance only shall be allowed or paid"), so by setting off its debt to Home State (if the set-off was proper), Shriver clearly "paid" that portion of its debt to Home State.

In sum, Reliance does not establish that Shriver had any sort of fiduciary obligation directly to Reliance prior to August 12, 1997. Home State certainly owed a duty to Reliance, but Shriver's obligation during that period was to Home State. Shriver's obligation to Reliance arose only after Reliance's letter of August 12-- after the set-off occurred. Reliance cannot use sec. 5/508.1 to overlook the contractually defined relationships and effectively bypass Home State and make Shriver its agent. Neither sec. 5/508.1, nor any other law of which we are aware, enforces a transitive property of agency, i.e. no law makes Shriver Reliance's agent just because Shriver was Home State's agent and Home State was Reliance's agent. Accordingly, Shriver's argument here fails.

II.  Set-Off

Reliance also argues that the set-off itself was not appropriate because Shriver and Home State did not share the proper kind of relationship. The parties seem to agree that the specific set-off at issue here--that between Shriver and Home State--is governed by the Illinois Insurance Code,/9 the relevant section of which opens by stating:

In all cases of mutual debts or mutual credits between [an insolvent insurer] and another person, such credits and debts shall be set off or counterclaimed and the balance only shall be allowed or paid . . . .

215 Ill. Comp. Stat. 5/206. Although set-off in favor of an insurance broker against an insurance company is generally permitted by the first

sentence of the statute, sec. 5/206 places a further, specific restriction on set-offs like the one at issue in this case:

No set-off shall be allowed in favor of an insurance agent or broker against his account with the company, for the unearned portion of the premium on any canceled policy, unless that policy was canceled prior to the entry of the Order of Liquidation or Rehabilitation, and unless the unearned portion of the premium on that canceled policy was refunded or credited to the assured or his representative prior to the entry of the Order of Liquidation or Rehabilitation.

Id. Reading these two quoted passages together--based on the general permissibility of set-off in the first sentence and the negative implication of the restrictive language in the subsequent statement--it becomes evident that under Illinois insurance law, set-off of unearned premiums on canceled policies, i.e. overpayments, are allowed against an insurance company in favor of its agent when three requirements are met:

(1) there are "mutual debts,"

(2) the "policy was canceled prior to" the insurance company's liquidation, and

(3) the "unearned portion of the premium on that canceled policy was refunded or credited to the assured . . . prior to" liquidation.

See 215 Ill. Comp. Stat. 5/206. If these conditions are met, set-off is permissible.

The second and third requirements are easily met. The companies comprising Home State Insurance Group were liquidated in October of 1997. (Quaker City was liquidated by the state of Pennsylvania on October 1, 1997.) But the 1996 Robinson and White policies were canceled effective on or before May 1, 1997. Further, the refund to Robinson and White was credited at the time they paid the balance due on the 1997 replacement policies (August 11, 1997). Thus, the 1996 policies were "canceled prior to" and the "unearned portion of the premium[s] [were] refunded or credited prior to" Home State's liquidation, as required by sec. 5/206. Reliance's argument that set-off was improper thus hinges on requirement (1)--whether the debts between Home State and Shriver were "mutual" within the meaning of the statute.

Section 5/206 was modeled on the federal Bankruptcy Act of 1898 and has been in effect since 1937, so analogies to bankruptcy have

appropriately influenced the interpretation of this section. In Stamp v. Insurance Company of North America, this court used just such an analogy to explain that, for the purposes of sec. 5/206, "mutual" means "contemporaneous and in the same capacity." 908 F.2d 1375, 1379 (7th Cir. 1990). The critical aspect of the meaning of "mutual" is thus temporal because "a pre-bankruptcy debt may not be offset against a debt arising after the filing." Id. at 1380. Here, both debts arose well prior to Home State's liquidation. The pre-liquidation/post-liquidation distinction--based on the analogy to pre-filing/post-filing debts in bankruptcy, see id.-- is the key element of mutuality under sec. 5/206. This distinction is further reflected in the requirement that the policy must be canceled prior to liquidation (thus resembling a pre-filing debt in bankruptcy). Further, even if we were to enforce a stricter standard of contemporaneity, the debts here would pass. Both debts--the $259,000 refund owed to Shriver by Home State and the premiums on the 1997 replacement policies owed by Shriver to Home State-- arose out of the same transaction: the cancellation of the 1996 policies and the immediate issuance of the 1997 replacement policies. Thus, the debts basically arose simultaneously.

But Reliance argues that the debts did not arise in the same capacity, and that, therefore, mutuality cannot exist. Reliance cites Lincoln Towers Insurance Agency v. Boozell for the proposition that "[w]here the liability of the party claiming the right to setoff arises from a fiduciary duty . . . the requisite mutuality of debts or credits does not exist." 684 N.E.2d 900, 905 (Ill. App. Ct. 1997). But this argument stumbles because Lincoln Towers is far from analogous to the present case. Lincoln Towers disallowed agents' set-off of premiums received and deposited into a trust account against earned commissions owed to the agents by the insurance company. Although the opinion is not entirely clear on this point, it seems that the plaintiffs in Lincoln Towers were trying to set off commissions earned after the liquidation order against premiums it had collected and deposited prior to the liquidation order. See 684 N.E.2d at 902 ("Approximately five months after the entry of the agreed order of liquidation, the producers filed the instant declaratory judgment action, seeking a declaration of their right to set off earned commissions against previously collected premiums due [to the insurance company]."). Thus, the Lincoln Towers decision turns on the temporal factors we have already discussed. See 684 N.E.2d at 904 (noting that the liquidator challenged the set-off because "the language of [sec. 5/206]

precludes a set off of the earned premiums which had not been credited prior to the date of the liquidation because, after the declaration of insolvency, there is no mutuality between the parties"). Set-off was properly disallowed in Lincoln Towers because an agent cannot set off a pre-liquidation debt it owed the insurer against a post-liquidation debt the insurer owed to it.

Lincoln Towers does contain general language suggesting that set-off may not have been appropriate here because one party had a fiduciary relationship to the other, but we are more persuaded by the specific language of sec. 5/206 that apparently permits Shriver's set-off. Section 5/206 specifically addresses the situation presented here-- the set-off of unearned premiums on policies canceled prior to liquidation of the insurer. If we were to conclude that Lincoln Towers controls this case, as Reliance urges us, we would be interpreting the Illinois Insurance Code in a fashion that renders its relevant provision ineffective. Lincoln Towers, as read by Reliance, mandates that any time an agent collects a premium, it does so in a fiduciary capacity that automatically eliminates "mutuality." But if Reliance is correct, then the relevant clause of sec. 5/206 that implies an agent's entitlement to set-off would be useless. Section 5/206 clearly contemplates an agent's ability to set off unearned premiums on a canceled policy against the insurance company, so it necessarily implies that a mere pre-liquidation agency (or fiduciary) relationship between an insurance agent and an insurance company does not disable the agent from setting off reciprocal pre-liquidation debts. We should not adopt an interpretation of a statute that renders a statutory section useless, see, e.g., Chicago Truck Drivers, Helpers and Warehouse Union (Independent) Pension Fund v. Century Motor Freight, Inc., 125 F.3d 526, 533 (7th Cir. 1997); Welsh v. Boy Scouts of America, 993 F.2d 1267, 1272 (7th Cir. 1993), and decline Reliance's invitation to find a lack of mutuality between Home State and Shriver. Therefore, we find that all the prerequisites for set-off under sec. 5/206 are met, and the set-off against Home State was proper.

Besides its defeat by the relevant statutory provisions, Reliance's claim to the $259,000 that was set off has no basis in equity. Robinson and White had already paid for coverage running through September of 1997, and Shriver had already paid that sum over to Home State. If we were to allow Reliance's $259,000 claim against Shriver, we would be forcing double payment for insurance coverage during the summer of 1997--the period when the 1997 replacement policies were

substituted for the canceled 1996 policies. Reliance may have had a claim against Home State for its fronting fee during this overlap, but neither Reliance nor anyone else furnished coverage that justifies forcing a redundant premium payment either from the insureds or from Shriver.

For the foregoing reasons, we reject Reliance's arguments and Affirm the judgment of the district court.

/1 The Home State Insurance Group was comprised of Home State Insurance Company, Quaker City Insurance, Pinnacle Insurance Company and Westbrook Insurance Company. Shriver's agency agreement was with each of these entities, and we shall refer to them collectively as "Home State."

/2 This contractual relationship makes sure that all losses on the policies will be paid by the reinsurer.

/3 Robinson's new policies went into effect on May 1, 1997. White's new policies went into effect on March 12 and 17, 1997.

/4 Under the agreement, Home State (acting through Quaker City) had the specific authority to withdraw funds from the premium trust account in order to (1) make payments to Reliance, (2) make payment of return premiums and commissions on canceled Reliance policies, (3) pay agents' commissions, (4) reimburse itself for reinsurance losses, (5) transfer to another account for claims services and (6) to make other withdrawals "related to" paid Reliance policies with the written consent of Reliance. See J.A. at 127.

/5 In its complaint, Reliance stated that the premiums owed to it by Shriver amounted to $259,169.15.

/6 The reinsurance agreement was between Reliance and Quaker City, and Quaker City's obligation to reinsure had been guaranteed by the Home State Insurance Group.

/7 Illinois courts have noted that the purpose of sec. 5/508.1 is "to protect a consumer who pays the agent from any further liability for the premium if the independent producer fails to remit to the insurer." Scott v. Assurance Co. of America, 625 N.E.2d 439, 442 (Ill. App. Ct. 1993). See also Zak v. Fidelity-Phenix Ins. Co., 208 N.E.2d 29, 35 (Ill. App. Ct. 1965).

/8 In fact, it tried to do so by asking Shriver to

enter into the retroactive agency agreement mentioned earlier.

/9 Quaker City was liquidated under the laws of Pennsylvania, and other members of the Home State Insurance Group were liquidated under the laws of other states, e.g. New Jersey. The contracts and actions central to this action, however, took place in Illinois, and as this court has noted, any statute in existence at the time the parties enter into a contract can be deemed to be part of that contract (in the absence of contrary terms). See Selcke v. New England Ins. Co., 995 F.2d 688, 689 (7th Cir. 1993). See also Lincoln Towers Ins. Agency v. Boozell, 684 N.E.2d 900, 903-04 (Ill. App. Ct. 1997). Therefore, we believe that we may follow the parties' lead and apply Illinois insurance law to this issue.